**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ONCORE MOTOR GROUP LLC, and | ) | Case No. 26-BK-04298 |
| REULAND ELECTRIC CO., | ) | Case No. 26-BK-04300 |
| | ) | |
| Debtors.[1] | ) | Hon. Nancy B. King |
| | ) | Chapter 11 |
| | ) | (Joint Administration Requested) |

**DECLARATION OF GRANT R. BIBBY IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Grant R. Bibby, declare under penalty of perjury:

1. I am the President and Chief Executive Officer of OnCore Motor Group LLC, a Tennessee limited liability company headquartered in Nashville, Tennessee ("OnCore"), and of its subsidiary Reuland Electric Co., a California corporation ("Reuland" and, together with OnCore, the "Debtors"). OnCore is a holding company and conducts no operations of its own. Its assets consist of the equity of Reuland and the equity of Motor Appliance Corporation, a Missouri corporation acquired in July 2026 that is not a debtor in these cases ("MAC").

2. As Chief Executive Officer, I have extensive knowledge of the operations and financial condition of the Debtors, including, among other things: (a) all operations, restructuring activities, and initiatives of the Debtors; (b) cash management and liquidity forecasting; (c) the development of, and revisions to, the Debtors' business plan; (d) the Debtors' relationships with their lenders, customers, and suppliers; and (e) engagement with creditors and other stakeholders.

[1] The Debtors in these Chapter 11 cases, along with the last four digits of Debtors' federal tax identification numbers are: OnCore Motor Group LLC (3510) and Reuland Electric Co. (2980). The corporate headquarters and mailing address for OnCore Motor Group LLC is 6323 Pettus Road, Antioch, TN 37013-4722. The corporate headquarters for Reuland Electric Co. is 1615 Yeager Ave, La Verne, CA 91750 and the mailing address is 225 North Unruh, City of Industry, CA 91744.

3. My professional biography is set forth below in the section of this Declaration that discusses the Debtors' management team.

4. Except as otherwise indicated, I base all facts set forth in this declaration (this "Declaration") on my personal knowledge, my review of business records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operational and financial condition. If called to testify, I would testify competently to the facts set forth in this Declaration, which I am authorized to submit on behalf of the Debtors.

5. On September 3, 2026 (the "Petition Date"), the Debtors commenced voluntary cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Tennessee (the "Court").

6. Reuland is an 89-year-old American manufacturer, highly experienced and advanced at building sophisticated equipment, and is growing significantly in key markets. Its backlog of firm customer orders stands at $14 million, up from a historical range of $8 to $10 million. It shipped approximately $949,000 in the recent week before the Petition Date, an annualized rate approaching $50 million against sales of $30.4 million last year. It is winning work in the markets where American manufacturing capacity is needed the most, including recent awards to supply military specification motors for Navy ships, nuclear grade motors for multiple nuclear facilities, and countless other important applications. Every month, Reuland is commencing about 100 new special projects. Reuland is in high demand. It serves more than 1,000 repeat customers, many for over thirty years, and employs 194 people. Since completing its facility relocation, it's been profitable overall on a monthly basis. It is 100% current with every secured lender and every equipment lessor and always has been, with one exception.

7. These cases are about that exception. Austin Financial Services, Inc. ("AFS") is Reuland's working capital lender. On July 31, 2026, AFS declared a default and accelerated its entire loan. It then wrote to Reuland's customers and told them to stop paying Reuland. On August 25, 2026, it sued Reuland and me personally in California state court captioned Austin Financial Services, Inc. v. Reuland Electric Co. and Grant Bibby, Case No. 26STCV26896 (the "AFS Action"), and announced in that complaint that it intends to ask that court to place a receiver over Reuland's entire business. There is no version of a receivership over this company that preserves it. The assets would be liquidated at the whim of one creditor, while destroying value of the ongoing operation for other secured and unsecured creditors, including AFS itself.

8. AFS initiated the AFS Action the day after I offered it $1 million in additional cash collateral and payment in full by the end of this year. I dispute what AFS says about how Reuland handled customer collections while it was fighting to make payroll, and I will answer it on a full record. But note what AFS is asking for. It wants a receiver over a company that offered to pay it in full. Its actions and inaction indicate that AFS is not acting responsibly or trying to get paid in full.

9. I submit this Declaration to describe the Debtors' background and the circumstances that led to the Chapter 11 Cases. I also submit this Declaration in support of the relief requested by the Debtors in the "first day" applications and motions filed with the Court (collectively, the "First Day Pleadings").

10. By the First Day Pleadings, the Debtors seek to, among other things:

(a) provide for joint administration of the Debtors' Chapter 11 Cases;

(b) obtain authority to use cash collateral to fund operations in the ordinary course;

(c) allow for the continued payment of wage, benefit, and tax obligations;

(d) ensure the continuation of the Debtors' cash management system without interruption;

(e) maintain the Debtors' insurance program, including workers' compensation coverage;

(f) provide adequate assurance of payment to the Debtors' utility providers;

(g) authorize the Debtors to honor prepetition customer obligations and continue customer programs in the ordinary course; and

(h) extend the deadline for filing schedules of assets and liabilities and statements of financial affairs.

11. I am familiar with each of the First Day Pleadings. Absent the relief requested in the First Day Pleadings, I believe that the Debtors would suffer immediate and irreparable harm that would jeopardize their ability to continue their business operations and complete the necessary restructuring. I further believe that the relief sought in the First Day Pleadings is critical to the Debtors' efforts to transition into chapter 11 efficiently and minimize disruption to their business operations, thereby permitting the Debtors to preserve and maximize value while pursuing confirmation of a plan of reorganization. Finally, I believe that the First Day Pleadings reflect a thorough analysis by the Debtors' management team and their professional advisors, and capture relief that is critical to the success of these proceedings.

12. This Declaration is divided into three parts. Part I describes the Debtors' business, organizational structure, and prepetition indebtedness. Part II describes the circumstances leading to the commencement of the Chapter 11 Cases. Part III summarizes the First Day Pleadings and explains why the relief requested in those pleadings is appropriate under the circumstances and necessary to avoid immediate and irreparable harm to the estates.

## PART I: DESCRIPTION OF THE DEBTORS

### A. The Debtors' Business

13. Reuland was founded in 1937 by Frank Reuland as a motor repair shop in Alhambra, California. Eighty-nine years later, it designs and manufactures custom electric motors for many of the most demanding and challenging applications in American industry. Reuland remained in the Reuland family for three generations until 2023.

14. Reuland is not a catalog company. It designs and builds motors to exact order, engineered to the specific performance characteristics each application requires. Its product line runs from fractional horsepower to more than 1,000 horsepower, and includes motors operating at speeds in excess of 50,000 RPM. At any given time, Reuland has between 500 and 700 unique custom motor orders in production simultaneously, each varying in size, specification, and application, for hundreds of different customers. Managing that volume of concurrent custom work is itself a core competency, and it is not one that can be reconstituted quickly if it is lost.

15. Reuland serves the United States Military, Navy, aerospace and defense manufacturers, government infrastructure including moving bridges and dams and flood control systems, steel and heavy industries, cranes and hoists, elevators and escalators, production machinery and equipment, the marine industry, nuclear facilities, and power generation and power stabilization systems. Reuland's products are Buy American compliant, which matters increasingly to its government and defense customers.

16. Reuland has more than 1,000 repeat and long-term customers. Many of those relationships have continued without interruption for more than 30 years. That is not an accident of inertia. Reuland's customers rely on Reuland because in many cases no one else builds what they need. Reuland has supplied motors for the substantial majority of moving bridges in the

United States for more than 60 years. A $600 million moving bridge installation does not operate without Reuland's motors delivered on time and to specification.

17. Reuland is vertically integrated and manufactures more than 95% of each motor internally, in the United States, across four manufacturing facilities. Three are in California and one is in Michigan. Reuland begins with raw material, including coil steel, raw aluminum ingot, and copper wire, and produces finished high-precision motors built to exact performance specifications.

18. Reuland's facilities are as follows: La Verne, California, which serves as headquarters and houses motor winding, assembly, testing, sales, and applications engineering; City of Industry, California, which houses a complete aluminum casting foundry and accounting and HR; Brea, California, which houses a full CNC machine shop with more than fifteen CNC machining centers; and Howell, Michigan, which houses a complete manufacturing and testing facility for larger motors. Reuland also maintains an engineering and applications sales operation in Cincinnati, Ohio.

19. Reuland maintains a network of hundreds of suppliers. Because each motor is unique and requires unique components, maintaining every process in the production chain is essential. A shortage of material in any single area slows production across the plant and reduces shipments.

20. Reuland sells through its own direct sales employees and through manufacturers' representatives located throughout the United States. Depending on the size of the order, Reuland may receive an initial payment and progress payments from a customer. Depending on the creditworthiness of the customer and the length of the relationship, Reuland also extends trade credit, with customers generally paying between 30 and 90 days.

21. In July 2026, OnCore acquired MAC, a motor manufacturer founded in 1946 and located in Washington, Missouri. MAC produces motors in smaller sizes than Reuland produces, and the acquisition expanded Reuland's product range, capabilities and customer opportunities. MAC is not a debtor in these Chapter 11 Cases.

22. As of the Petition Date, Reuland holds a backlog of approximately $14 million in firm purchase orders, together with a steady stream of incoming repeat orders and new business. Sales and repeat customers are among the company's greatest strengths.

**B. The Debtors' Employees**

23. Reuland employs approximately 194 people. All but 8 are full-time. They include highly skilled technicians and machine operators who build the components and assemble the motors, engineers who design the motors and guide the manufacturing process, and dedicated personnel in operations, sales, accounting, administration, human resources, systems, and production control.

24. Many of Reuland's employees have been with the company for 20 or 30 years. Several have been with the company for 50 years. These are skilled positions, compensated accordingly, and they are good jobs that people have held for decades. The institutional knowledge of this workforce cannot be replaced on any timeline that would permit the business to continue. Throughout the events described in Part II, and notwithstanding significant financial strain, Reuland has always consistently met its payroll every week and every month without exception. Reuland has been a very stable place of employment for decades.

**C. Corporate Structure and Venue**

25. OnCore is a Tennessee limited liability company organized in 2021 and headquartered in Nashville, Tennessee. Its principal place of business, its books and records, and

the management of its affairs have been located in Nashville, Tennessee at all times during the 180 days preceding the Petition Date. OnCore is a holding company and conducts no manufacturing operations of its own. Its assets consist of the equity of Reuland and the equity of MAC.

26. Reuland is a California corporation and a majority-owned subsidiary of OnCore.

27. Venue is proper in this District under 28 U.S.C. § 1408(1) as to OnCore, whose domicile and principal place of business have been in Nashville, Tennessee for the 180 days preceding the Petition Date, and under 28 U.S.C. § 1408(2) as to Reuland, whose affiliate OnCore has a case pending in this District.

28. A chart illustrating the Debtors' organizational structure, including certain non-debtor entities, is attached to this Declaration as **Exhibit A** and incorporated herein by reference.

**D. Management Team**

29. The Debtors' senior management consists of myself as President and Chief Executive Officer, Chris Strong as Chief Financial Officer, Altaf Syed as Vice President of Product Development, and Lonnie Seratt as Vice President of Operations.

30. I acquired Reuland from the Reuland family in July 2023. Before Reuland, I founded Orchid International in 1988 and built it into a manufacturing business with peak revenue in excess of $150 million per year. I sold the automotive division to Technia in 2016 and sold the electrical steel division to UPG Enterprises in 2022.

**E. Financial Performance**

31. For the fiscal year-ended December 31, 2025, Reuland recorded total sales of approximately $30.4 million. It incurred a loss due to the costs associated with the facility move, as well as being charged just under $2.0 million of interest by AFS during 2025.

32. The operational picture as of the Petition Date is materially better than it was a year ago. The relocation described in Part II is complete. Costs have been reduced, shipment levels are up, and Reuland is generating a monthly profit and positive cash flow from operations. In the week before the Petition Date, Reuland shipped approximately $949,000, an annualized run rate approaching $50 million. The business that will be reorganized in these cases is a functioning, profitable manufacturer with a substantial order book, not a business in operational decline.

33. Reuland's forward opportunities are concentrated in the markets where American manufacturing capacity is needed the most: Military, Navy, Infrastructure, Nuclear, Industrial and Heavy Manufacturing. Reuland's vertically integrated US based manufacturing operations turn raw materials into high performance advanced electric motor systems. We are proud to be Made in the USA and supporting our critical infrastructure and key industries.

**F. Prepetition Capital Structure**

34. AFS provides Reuland's working capital facility. The AFS relationship long predates my acquisition of Reuland. It began on or about January 12, 2010 under a Loan and Security Agreement (together with all amendments, the "AFS Loan Agreement"), which was amended and restated on August 12, 2022 and has since been modified fifteen times, most recently by Modification Number Fifteen to Loan and Security Agreement ("Modification Number Fifteen") dated March 16, 2026.

35. The facility consists of a revolving line of credit with a total commitment of $7,500,000, inclusive of a $4,700,000 sublimit for advances against inventory, and Term Loan B in the original principal amount of $4,000,000, for total loan facilities of $11,500,000. AFS asserts a security interest in substantially all of Reuland's assets, including accounts, deposit accounts, inventory, general intangibles, funds in the collection account, proceeds, and books and records.

AFS perfected by a UCC-1 financing statement filed with the California Secretary of State on October 15, 2009, continued in 2014, 2019, and 2024.

36. Modification Number Fifteen recites that the outstanding loans stood at $10,902,829.11 as of March 10, 2026. AFS's complaint asserts a balance of not less than $10,650,587.68 as of August 25, 2026.

37. In July 2023, in connection with my acquisition of Reuland, I executed a Continuing Guaranty in favor of AFS. I am a defendant in the action described in Part II by reason of that guaranty.

38. AFS was acquired by Stearns Bank, N.A. ("Stearns Bank"). Stearns Bank has held a mortgage on Reuland's Michigan property (the "Michigan Property") since July 2023, recorded in Livingston County, Michigan on August 2, 2023, in the original amount of approximately $1,735,000.

39. Modification Number Fifteen required Reuland to sell the Michigan Property. As a condition of the March 2026 agreement that termed out the over-advance, Reuland granted AFS a security interest in the Michigan Property securing $750,000, subordinate to the Stearns Bank mortgage. The same agreement required Reuland to consummate a sale of the Michigan Property on or before August 31, 2026, for proceeds sufficient to pay the Stearns Bank mortgage in full and to remit an additional $750,000 to AFS. Reuland performed. We closed a sale-leaseback of the Michigan Property in June 2026, paid off the Stearns Bank mortgage, and paid AFS $750,000. Reuland continues to occupy the Michigan Property as a tenant.

40. Byline Bank ("Byline") holds a loan in the original principal amount of approximately $5.0 million, made in July 2023 under the Small Business Administration's 7(a) program, which helped finance my acquisition of Reuland. As of the Petition Date the outstanding

balance is approximately $3,966,600.95. OnCore and Reuland are obligors. The Byline obligation is current and no payments have been missed.

41. Reuland finances a substantial portion of its manufacturing equipment through separate equipment financing arrangements with approximately twenty lenders. As of July 2026 the aggregate outstanding balance was approximately $4.0 million. Every one of those lenders is current. Reuland has not missed a single payment to any of them.

42. As of the Petition Date, Reuland's trade payables and other general unsecured obligations total approximately $5.0 million, owed to approximately 280 vendors and service providers.

## PART II: EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A. The Acquisition and the Relocation Reuland Was Required to Undertake

43. When I acquired Reuland from the Reuland family in July 2023, the acquisition did not include the California land on which the company had operated for sixty-five years. The family sold that land separately, to a developer, for a substantial sum. Including it in the transaction was not possible. Every other asset of the business was acquired, including the land and facility in Michigan.

44. The developer intended to demolish the existing buildings and construct a warehouse. As a consequence, the acquisition agreement required Reuland to vacate and relocate to new leased premises in California. That obligation was not optional and it was not negotiable. It came with the company.

45. The scale of what that required is difficult to overstate. The site comprised ten acres and two large buildings and held hundreds of machines, together with equipment and inventory distributed throughout the buildings and grounds. Moving a vertically integrated motor

manufacturer is not a matter of packing and hauling. An aluminum casting foundry had to be decommissioned and rebuilt. Hundreds of machines and processes had to be permitted and approved, broken down, moved, installed, calibrated, and requalified. And all of it had to happen while the plant continued manufacturing and shipping motors to customers who depend on Reuland.

46. After securing the new leased facilities, we learned that relocating an industrial operation in California is governed by a permitting process far more protracted than anyone had told us to expect. Permits took ten to fourteen months on average before work could begin. Approvals arrived in partial increments, each followed by further questions, further engineering and architectural work, and further submissions. Final approval came in March 2026. The last portion of the move was completed in April 2026.

47. The relocation consumed two and a half years and cost more than $10 million, including physical move costs, years of overlapping rent, overtime and premium production costs, and compounding interest from AFS. Throughout, Reuland operated partially out of multiple locations and incurred substantial overtime to protect its delivery commitments. A late motor on a moving bridge, a Navy vessel, or a nuclear facility is not merely a commercial inconvenience but a critical failure that must not be incurred, at almost any cost. Reuland found itself in the situation and did its best to maintain delivery commitments but that came at a significant cost.

**B. The AFS Over-Advance and What It Cost**

48. The losses associated with the move required an over-advance under the AFS facility. AFS agreed to provide one. I want to describe what it cost, because the pricing of that accommodation is the single largest reason the AFS balance is what it is today. In early 2024 prior to commencing the move, the loan balance with AFS was approximately $4.5 million total.

49. Under Section 2.6(f) of the AFS Loan Agreement as amended, AFS charged an over-advance fee of three percent of the average outstanding over-advance balance. That is three percent per month — not per year — charged in arrears, in addition to base interest. When the over-advance exceeded $1,500,000, the fee rose to four percent per month.

50. Together with base interest of approximately one percent per month, the total cost of the over-advance reached approximately five percent per month. Those amounts were not paid in cash. Under Section 2.7(e) of the AFS Loan Agreement, interest not paid when due is deemed to be a new Advance, so the charges were added to the balance and the following month's charge was computed on the larger balance. Compounded monthly in that manner, five percent per month is an effective annual rate of approximately 79.6 percent.

51. That fee was charged on top of base interest, which carried a rate floor that AFS increased over successive modifications from 3.50% to 5.75% and at one point to 8.50%, plus a spread of 2.25%. It was charged on top of a collateral management fee of approximately $20,000 per month, calculated monthly against the average outstanding loans, which AFS increased from 0.15% to 0.20% to 0.25%. It was charged on top of an annual facility fee payable in advance.

52. Two provisions of the AFS Loan Agreement compound the arithmetic. Section 2.7(e) provides that any interest not paid when due "shall thereafter be deemed to be an Advance" and bears interest from that point forward. Unpaid interest becomes principal. And Section 2.7(d) provides that when AFS applies a payment to reduce the Advances, "the principal amount paid down shall continue to accrue interest through the end of the third Business Day after the payment was applied." Reuland deposits collections daily and AFS applies them the next Business Day, so Reuland pays three additional days of interest on principal AFS has already been repaid.

53. The result was that interest and fees payable to AFS reached approximately $230,000 per month. Those amounts were added to the balance and the following month the fee was computed on the larger balance. At this rate, the outstanding loan is growing too fast to manage. The outstanding balance with AFS is growing and growing from $4.5 million in early 2024 to just under $11.0 million today.

54. The clearest way to describe what that structure did is this. During calendar year 2025, Reuland received no new funds from AFS. The line limit never moved. The over-advance grew by $1.9 million over the course of the year. All of it was fees and interest. The AFS balance did not become unmanageable because Reuland borrowed more. It became unmanageable because of the rate at which it compounded.

55. The pricing was reset repeatedly, and each reset accompanied a short-term accommodation. In one modification, in exchange for a temporary $500,000 increase in the inventory sublimit and a five-point increase in the inventory advance rate, both of which expired within a matter of weeks, AFS raised the interest rate floor from 5.75% to 8.50%, raised the collateral management fee, raised the early termination fee from 0.25% to 2.0% of the entire $7,500,000 commitment, and charged an immediate facility fee equal to 3% of the temporary increase. A preceding modification charged 2% of a temporary increase on the same basis.

56. Reuland accepted these terms because the alternative was to stop paying suppliers in the middle of a relocation the company had no choice but to complete. I do not offer that as an excuse for the size of the balance. I offer it as an explanation of where the balance came from.

**C. Management's Extensive Efforts**

57. Through the relocation and the financial strain that accompanied it, management took every step available to protect the business and its stakeholders:

(a) Reuland met payroll every week and every month, without exception, for all of its employees, throughout the very difficult two and a half year move and relocation.

(b) Reuland maintained its relationships with key suppliers. We have not been able to pay every supplier on time, but the substantial majority have continued to support us, and we continue to steadily work down the overdue payables.

(c) With the sole exception of AFS, Reuland has remained current with every secured lender and lessor, including all twenty equipment lenders. Not a single payment has been missed.

(d) I personally raised $1.6 million of new money for the business, consisting of $900,000 in equity through the sale of shares in Reuland and $700,000 in loans, and put all of it into move costs, payroll and overdue payables.

(e) Reuland negotiated the sale of its brake product line, an auxiliary product line representing approximately 6% of revenue, for $2.25 million plus contingent consideration. This additional capital is intended to help provide sufficient funds to facilitate the replacement of AFS with another lender.

(f) Reuland has completed the relocation, reduced costs, restored monthly profitability and positive operating cash flow, and grown its backlog from a historical range of $8 to $10 million to $14 million.

58. I do not suggest that management performed flawlessly. However, the Debtors did not arrive at this Court having failed to act. Reuland has raised capital, sold assets, cut costs, restored profitability, grown its order book, and paid every lender but one on time.

**D. Modification Number Fifteen**

59. In January 2026, we approached AFS to stop the compounding. The result was Modification Number Fifteen, dated March 16, 2026. It converted $4,000,000 of the revolving

over-advance into a term loan, Term Loan B, at a materially lower rate. That agreement stopped the escalation, and I was grateful for it at the time.

60. Modification Number Fifteen also did two other things.

61. First, it required Reuland to grant AFS a $750,000 security interest in its Michigan property and to consummate a sale of that property on or before August 31, 2026, remitting $750,000 to AFS. Reuland performed that obligation. It completed a sale-leaseback of the Michigan facility in June 2026 and paid AFS $750,000. I want to be clear that this was a contractual requirement of Modification Number Fifteen, that Reuland sell its remaining property in Michigan and provide $750,000 to AFS, plus pay off the first mortgage of approximately $1,650,000 held by Stearns Bank, now controlling AFS, for a total debt paydown of $2.4 million in June 2026. Reuland accomplished this and paid this amount to AFS and Stearns.

62. Second, Modification Number Fifteen set a fixed schedule reducing the rate at which Reuland could borrow against its own inventory: 65% through August 31, 2026; 60% beginning September 1, 2026; 55% beginning March 1, 2027; and 50% beginning September 1, 2027.

63. That schedule matters more than it may appear. Reuland's inventory sublimit is $4,700,000. A five-point reduction in the advance rate removes roughly $350,000 of borrowing availability on a fixed calendar date, whether or not the business can manage the change in formula. Modification Number Fifteen therefore committed Reuland to a borrowing base that would shrink on a schedule, while at the same time requiring $10,000 in term loan payments every week and a $500,000 lump sum payment by December 31, 2026. The step down to 60% was scheduled for September 1, 2026.

**E. The Inventory Ineligibility and the Borrowing Base Shortfall**

64. Even with all these large payments to AFS, Reuland was managing with tight cash flow. The move recovery plan was working until Reuland encountered a further problem with the AFS borrowing base.

65. In April 2026, AFS added a slow-moving inventory ineligibility of $500,000. The AFS Loan Agreement gives AFS broad discretion to do this. The definition of Borrowing Base permits AFS to apply "such lesser percentage" of eligible inventory "as Lender in its sole discretion may deem appropriate," to impose a dilution reserve "as determined by Lender in its sole discretion," and to establish a Borrowing Base Reserve (as defined in the AFS Loan Agreement).

66. Reuland produces thousands of different motors, ordered in low quantities over long periods. Some of its inventory is by definition slow-moving. That is the nature of a custom motor business serving installed infrastructure. The company stocks what its customers will need when they need it, and a component that turns once every three years is not dead inventory. It is the reason a customer with a forty-year-old bridge drive calls Reuland instead of someone else.

67. The ineligibility landed at the end of the relocation but before the Michigan sale-leaseback funded. In that interval, Reuland was at a low point in material purchasing due to cash flow while awaiting the Michigan sale leaseback proceeds, which resulted in several weeks of lower shipments. Lower shipments reduced accounts receivable. Reduced receivables, plus a $500,000 inventory ineligibility, reduced availability under the borrowing base formula. Reuland was borrowing at the $7,500,000 line limit and could not pay the line down when the formula fell short of that amount.

68. The mechanics of the facility are central to what followed. Customer payments are received into a collection account at Hilltop Bank. Reuland is required to remit collections to AFS. AFS applies the borrowing base formula to determine whether funds may be advanced back. If Reuland remits collections when the availability formula is too low, the funds are not returned. The formula is calculated from reports generated by Reuland's legacy enterprise system and assembled through formulas and ineligibility calculations maintained by AFS.

69. Money moves in both directions nearly every day. In a typical month Reuland sends AFS approximately $2.5 to $3.0 million, and AFS returns approximately $2.5 to $3.0 million, less interest and fees. That is what a revolving line of credit is. Receivables are collected and used to pay expenses, and those expenses generate the next round of receivables.

70. The line has a limit of $7,500,000. Reuland has been at that limit almost continuously for two years. It was at $7,500,000 before the events AFS complains of. It is at $7,500,000 today. AFS's exposure on the revolver has not increased by a dollar. Separately, the $4,000,000 term loan created in March 2026, which consists largely of the enormous capitalized interest and fees, has been paid down to $3,000,000, a reduction of $1,000,000 in the last two months.

71. What changed was not the amount Reuland borrowed, it always remained at or below $7,500,000. What changed was what Reuland was permitted to borrow. AFS added $500,000 of inventory to the ineligible calculation. At the same time, a supplier struggling with its own relocation failed to deliver components, delaying approximately $1,000,000 in shipments. The AFS formula counts only shipped orders, so finished motors sitting on the floor waiting on a single component contribute nothing to availability. Between the ineligibility AFS imposed and

the shipments the supplier delayed, and other material shortages awaiting payment, the formula based availability calculation fell below $7,500,000 for a period of time.

72. The borrowing base moves for many reasons, including contra offsets, cross-aging, dilution reserves, and discretionary ineligibility determinations. Reuland submits the underlying data and runs it through a locked spreadsheet with formulas developed and controlled by AFS. The spreadsheet runs providing a number to be entered into our availability calculation. The number can vary greatly. Reuland receives the result. It does not receive the calculation or detail. This has caused us to be working in the dark. Over the last few weeks, we have developed a new system to be able to understand and calculate all ineligibilities by ourselves without AFS.

73. When the formula fell short on a payroll day, Reuland had to pause the daily round trip of sending the money to AFS and borrowing it back. The company could not send receipts to AFS that it knew AFS would not return, because had it done so it could not have made payroll for 194 people or purchased the material required to build the orders then in production. Reporting followed remittance, and receipts that were not submitted were not reported as submitted. I do not dispute that this occurred. I dispute entirely what AFS says it means.

74. AFS asserts that Reuland diverted not less than $3,147,800.86. That figure is an accumulated total of receipts that did not make the round trip during a period. It is not a loss and it does not correspond to anything missing.

75. The reason is arithmetic. When the daily cycle pauses, the receipts not sent accumulate into a large number. That number would normally be matched by advances AFS would send back to us. Neither transaction happens if the cycle is paused or interrupted. The line still remained at $7,500,000. It's a revolving line of credit. Receivables were collected and used for payroll and operating costs to generate new receivables to offset the receivables collected. Adding

up the gross figure on only one side of a paused two-way flow and cycle, measures nothing. AFS is using this number to confuse and make it sound like money went missing. Nothing is missing. The line is still at $7,500,000 (plus AFS new accrued interest and fees). The borrowing base receivables are larger than they were previously. Nothing is missing, it's the opposite, additional receivables collateral value has been added to improve AFS's position.

76. What has happened since further proves the point. Because AFS has made clear it will not return funds, Reuland has been unable to resume the cycle. Over the past four weeks approximately $3,000,000 more has not been sent in either direction. Based on AFS's math, we have now directed or taken more than $6,000,000. There is no $6,000,000 missing. If we paused for a year and then restarted the two way cycle, the one-way number would be $36 million diverted and taken. Obviously this does not make sense, but it is precisely what AFS claims. There is nothing missing. This is a revolving credit line. The accumulated volume of transactions in and out is a big, but meaningless, number. The only measure is the calculation of the borrowing base availability versus the amount borrowed. The end result and balance is what matters.

77. AFS's own audit analysis produced a different number than they claim against us. When Reuland brought the shortfall to AFS's attention, AFS's internal auditor examined it and determined that Reuland was $675,000 short on availability formula to match the $7,500,000 line. This included additional interest and fees of approximately $125,000. The audit was performed by AFS's own person, applying AFS's own formula, to AFS's own facility. The July 31, 2026 default notice then stated the figure as approximately $2,375,473.66. The complaint, filed one month later, states $3,147,800.86. The same issue has been assigned three different numbers, each larger than the one before it.

78. Throughout this period AFS’s security position has not deteriorated. It has strengthened. Reuland is generating new receivables faster than it is collecting them, and there are more receivables in AFS's collateral today than there were two months ago. As of August 31 this week the borrowing base calculation stood at approximately $7,540,000 against the $7,500,000 limit. Reuland made it back in formula, with no shortfall. Except it would not last long, another 5% reduction in the inventory advance rate takes effect on September 1, so availability drops by $348,000, bringing down the availability to approximately $7,200,000.

79. One further point bears on the characterization. A substantial portion of what moves back and forth is not the collection of accounts at all. It is cash-in-advance deposits Reuland receives from customers to fund production. Those amounts are earned on receipt and no receivable is being collected when they are remitted. Reuland has been sending them to AFS because AFS instructed it to, but they are not proceeds of any account and should not be sent to AFS anyway, or considered part of receipts towards receivables.

80. I told AFS what had happened. I told them Reuland would invest additional funds to cure any shortfall and would make a further paydown to improve their position. I later put a complete, funded proposal in writing. AFS did not accept it or even respond in a meaningful way. It sued instead, and it announced that it would ask a state court to appoint a receiver.

81. I do not believe AFS is trying to recover its money in a prudent manner. Its exposure on the revolving line has not moved in two years. Its collateral is stronger today than it was in the spring. It was offered payment in full within four months. What AFS has done is to take meaningless data, mischaracterize it as theft, and use that characterization to justify seizing an operating company. These are matters this Court will have occasion to examine as these cases

proceed, and the Debtors reserve all rights, claims, defenses, and counterclaims with respect to AFS's conduct and its claim.

**F. The Default Notice and the Notices to Reuland's Customers**

82. On July 31, 2026, AFS delivered through its counsel a Notice of Default, Acceleration, Demand for Payment, and Reservation of Rights (the "Default Notice"). The Default Notice attached a schedule identifying sixteen asserted covenant defaults, terminated any obligation of AFS to extend further credit, accelerated the entire balance, demanded immediate payment in full in cash, and imposed the default rate of interest. It was sent to Reuland's three California locations and to my home address in Tennessee.

83. AFS then began writing to Reuland's customers. On August 6, 2026, it sent notices of assignment under section 9406 of the California Commercial Code directing them to remit payment to AFS rather than to Reuland. On August 26, 2026, it sent a second round of letters superseding the first and providing new wire instructions to an account at Stearns Bank. AFS sent these letters by registered mail, one after another, and also emailed and telephoned Reuland's customers.

84. Reuland's customers are not anonymous account debtors. Many have bought from Reuland for more than thirty years, and a number of them contacted Reuland directly when the letters arrived to ask what was happening. Reuland's credit department maintains a standing policy, unrelated to AFS, that customers should not change remittance information without written notice from Reuland confirmed by telephone, because payment redirection fraud is a persistent problem in our industry. When customers called, Reuland told them its remittance address had not changed and that there was a dispute with its lender.

85. The result was not that customers paid AFS. The result was that many of them stopped paying anyone. One customer wrote to Reuland that because it had received "contradictory information from both parties," it would not remit payment to either "until we receive unified instructions from both parties." That response was typical. Other customers continued paying Reuland. Others held everything.

86. For approximately three weeks before the Petition Date, Reuland received materially reduced customer receipts. It strained our ability to pay vendors who were already extended from the relocation period. That is the position the Debtors are in as of the Petition Date, and it is the reason the relief requested in the Cash Collateral Motion includes a direction to its customer account debtors that they may safely pay the Debtor.

87. I should be direct about one thing. During this period, members of Reuland's credit department communicated with customers who had elected to withhold payment and asked customers to continue holding while the dispute was being resolved. AFS characterizes those communications as instructions to disregard its notices. I do not agree with that characterization, and the Debtors reserve all rights on the question. What I can say is that Reuland was facing a lender that was not acting responsibly, had accelerated its entire loan, refused to fund payroll, and was pressuring our customers not to pay us for the motors we have been building for them for decades, but to pay a financial services company they have never heard of. This caused a huge problem and Reuland's people were trying to keep the company operational. The Debtors have asked this Court to resolve where payments should go, and once that is resolved there will be no ambiguity for anyone.

**G. Reuland's Proposal**

88. Over the following four weeks Reuland worked to put a complete, funded proposal in front of AFS. On August 25, 2026, I sent it in writing. It offered:

(a) an immediate paydown of approximately $200,000 to eliminate the borrowing base shortfall and bring the line back within formula, including accrued interest and fees;

(b) an immediate investment of approximately $375,000 into the company to fund payroll and vendor payments;

(c) $1,000,000 of cash collateral to AFS, funded $500,000 at the closing of the brake business sale (estimated to be September 30) and $250,000 on each of October 31 and November 30, 2026;

(d) a sixty-day deferral of the scheduled September 1 reduction in the inventory advance rate; and

(e) payoff of the AFS facility in full by December 31, 2026, through a combination of new bank financing and an equity raise.

89. The proposal was supported by a cash flow forecast, by shipments that had reached approximately $949,000 in a single week, and by explaining the commitment we had received for the sale of the brake product line for $2.25 million. I also pointed out and reminded AFS that the balance owed to AFS had already been reduced by approximately $1.0 million since March 2026, and that with the paydowns and cash collateral offered, AFS would receive more than $2.1 million between March and November 2026 while its collateral position improved rather than deteriorated.

90. I still have not received a response. Over the preceding weeks I had sent detailed emails and provided our borrowing base calculation and all supporting reports each day. Our borrowing base has steadily been increasing, so I've been sharing the good news on a daily basis.

I've written numerous emails to multiple people within AFS and received no responses. We have approached AFS with a very substantial and positive offer to work with us that most lenders would welcome. It's been impossible to discuss and reach an agreement.

91. On August 28, 2026, I executed a letter of intent for the sale of Reuland's brake product line to RPM Industrial Sales, LLC. The transaction has not closed. An initial payment of $250,000 was received on August 31, 2026 against an inventory purchase order. A further $500,000 of the purchase price was expressly conditioned on Reuland and AFS entering into a new modification agreement, which has not occurred. With the protections of chapter 11 in place, the Debtors will reassess whether a sale of the brake product line remains in the best interests of the estates. If the Debtors determine to proceed, they will likely be required to do so by motion under section 363 of the Bankruptcy Code, on notice and subject to this Court's approval.

**H. The Lawsuit and the Threatened Receivership**

92. On or about August 25, 2026, rather than respond to my proposal to them for a solution, AFS filed the AFS Action against Reuland and against me personally in the Superior Court of California for the County of Los Angeles. Reuland and I were not served, and only learned about the filing on August 31, 2026 through an unrelated third party.

93. The complaint pleads seven causes of action including: breach of contract against Reuland; breach of guaranty against me; common counts for money lent and account stated; foreclosure and recovery of personal property; conversion against Reuland and me; and violation of California Penal Code section 496(c) against Reuland and me. It seeks not less than $10,650,587.68 in contract damages, not less than $3,147,800.86 in conversion damages, punitive damages, treble damages and attorneys' fees under section 496(c), and the appointment of a receiver.

94. I take these allegations seriously and I do not dismiss them. The Debtors dispute AFS's characterization of what occurred and reserve all rights, claims, defenses, and counterclaims. These are contested matters that will be resolved on a complete record, through the claims process, an adversary proceeding, or otherwise as this Court directs. They are not matters that can or should be decided on the first day of these cases.

95. What requires immediate attention, however, is the receivership. AFS pleads that it intends to apply separately for appointment of a receiver over Reuland's business, assets, and collateral, including its accounts, deposit accounts, inventory, equipment, general intangibles, books and records, and proceeds.

96. A receivership would not preserve this collateral. It would destroy it. At any given moment Reuland has between 500 and 700 unique custom motor orders in production, each engineered to a particular customer's specification, each at a different stage across an aluminum foundry, a CNC machine shop, a winding and assembly operation, and a Michigan plant that builds the large motors. That work in process has enormous value as a stream of deliveries to customers who are reliant and waiting on Reuland's delivery. It has very little value as an inventory of partially machined castings and half-wound stators. Reuland's most valuable assets are its engineering knowledge, its 194 employees, and a thousand customer relationships built over almost ninety years. None of those survive a receivership. Within weeks the $14 million backlog would be gone, and with it the collateral AFS says it wants to protect.

97. I cannot reconcile the appointment of a receiver with AFS's own interests. Reuland offered AFS $1,000,000 in additional cash collateral and payment in full within four months, funded by the sale of the brake product line and supported by improving shipments that would have driven further paydowns. AFS did not accept that offer. It did not counter it. It sued, and it

announced that it would ask a state court to appoint a receiver to liquidate the receivables and inventory of a profitable, fully operating business where 194 people build critical products every day.

98. Throughout this period AFS has not engaged with us in any substantive way. It has not sought to understand how this business actually works. What it has done instead is characterize meaningless data from its own paused cash management cycle as the theft of millions of dollars, and use that characterization as the basis for a lawsuit and a receivership application.

99. Reuland is current with every lender it has. We have positive relationships and zero issues with all of them. The single exception is AFS.

100. Given AFS's conduct and the instability of that relationship, the Debtors concluded they had no responsible alternative but to seek the protection of this Court for the company, its employees, its customers, its suppliers, its investors, and all of its stakeholders.

**I. The Decision to Commence These Cases**

101. The Debtors did not commence these cases to avoid the AFS Action or to escape its merits. They commenced these cases because a receivership over an operating custom manufacturer is a liquidation conducted under another name, and because chapter 11 provides a forum in which the business can continue to operate, customers can be told with authority where to send their payments, AFS's claims can be adjudicated on a complete record, and every creditor can be treated according to law.

102. The Debtors' objectives are straightforward. First, to stabilize operations and restore the normal flow of customer payments so the business can continue to produce and ship against its backlog. Second, to preserve the employment of 194 people and the relationships with hundreds of suppliers and more than a thousand customers. Third, to replace the AFS facility with

a working capital lender on ordinary commercial terms. Fourth, to resolve AFS's claims in an orderly way. Fifth, to emerge from chapter 11 promptly.

103. Reuland is a profitable business with a $14 million backlog, an irreplaceable customer base, substantial hard assets, and its principal problem is only one bad lending relationship that can be replaced. The Debtors intend to pay their creditors in full and will be held to what the evidence ultimately shows.

## PART III: SUMMARY OF THE FIRST DAY PLEADINGS

104. Concurrently with the filing of the Chapter 11 Cases, the Debtors have filed the First Day Pleadings. Having reviewed each of the First Day Pleadings or had their contents explained to me, I believe that the Debtors would suffer immediate and irreparable harm if the relief requested in the First Day Pleadings is not granted on the terms proposed. In my opinion, approval of the relief sought in the First Day Pleadings is critical to the Debtors' efforts to stabilize operations and conduct these cases efficiently, thus permitting the Debtors to preserve and maximize value for the benefit of all stakeholders.

105. Certain of the First Day Pleadings request authority to pay certain prepetition claims. I am advised by the Debtors' legal advisors that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court may not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of that exception, the Debtors have limited their requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Certain aspects of the relief sought in the First Day Pleadings will accordingly be deferred for consideration at a later hearing, as indicated in the respective pleadings.

**A. Joint Administration Motion**

106. Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only. Given the organizational structure of the Debtors, I believe that joint administration would provide significant administrative convenience without harming the substantive rights of any party in interest. Many of the motions, hearings, and orders in these cases will affect both Debtors, and joint administration would eliminate the need for duplicate pleadings, notices, and orders on each docket. That, in turn, would save the Court, the Debtors, and other parties in interest substantial time and expense.

107. Because the Debtors seek only administrative, and not substantive, consolidation of the estates, joint administration would not adversely affect the Debtors' respective estates. I believe the relief requested will preserve individual creditors' rights while providing those creditors the benefit of the cost reductions associated with joint administration.

**B. Cash Collateral Motion**

108. Pursuant to the Cash Collateral Motion, the Debtors seek authority to use cash collateral to pay wages, benefits, insurance, rent, raw materials, utilities, and other operating expenses in accordance with a proposed budget. Permitting the Debtors to use cash collateral will allow the Debtors to avoid disruption of the business, keep the workforce in place, continue producing against the backlog, and complete this reorganization.

109. The Debtors' cash collateral consists principally of accounts receivable generated by shipments to customers and the proceeds of inventory. Reuland ships continuously against a rolling backlog of approximately $14 million in firm orders. Without authority to use cash collateral, Reuland cannot purchase raw material, cannot pay the workforce that converts that

material into finished motors, and cannot ship. Within days, that would halt production. Within weeks, it would cost the Debtors customers that took decades to earn.

110. As adequate protection, the Debtors propose to maintain the status quo and to provide the prepetition secured parties with replacement liens under 11 U.S.C. §§ 361(2) and 552(b) to the extent of cash collateral actually expended, on the same assets and in the same order of priority as existed immediately prior to the Petition Date.

111. I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue operating without disruption and to maximize the value of their assets.

### C. Wages Motion

112. Pursuant to the Wages Motion, the Debtors seek authority to pay certain prepetition wages, salaries, and other compensation, together with related taxes and withholdings, to honor and continue their employee benefit programs, and related relief.

113. As of the Petition Date, Reuland employs approximately 194 people, of whom all but 8 are full-time. Of the full-time employees, 39 are exempt. The employees are integral to the Debtors' operations. They perform functions critical to ordinary course operations and, as a whole, possess an essential working knowledge of the Debtors' business that cannot easily be replaced. This is not generic language. Reuland runs an aluminum foundry, a large CNC machine shop, and a custom winding and assembly operation producing 500 to 700 unique orders at a time. Many of these employees have practiced their craft at Reuland for twenty, thirty, or in several cases fifty years.

114. The Debtors maintain the following compensation and benefits programs and pay various administrative fees and premiums in connection with them: employee compensation;

payroll processing fees; withholding obligations; health programs; workers' compensation; 401(k) plan, life insurance, paid leave, and other programs.

115. Subject to the Court's approval, the Debtors intend to continue their employee compensation and benefits programs in the ordinary course, including honoring prepetition obligations arising under them. The Debtors further request confirmation of their right to modify, change, and discontinue any of those programs and to implement new programs, policies, and benefits in the ordinary course of business during the Chapter 11 Cases, in their discretion and without further Court approval, subject to other orders entered in these cases and the requirements of the Bankruptcy Code.

116. Specifically, the Debtors seek authority, but not direction, to pay or honor prepetition amounts on account of the employee compensation and benefits programs, in the amounts set forth in the Wages Motion. Except as separately identified in the Wages Motion, the Debtors do not seek authority to pay any employee an amount exceeding the priority cap set forth in section 507(a)(4) of the Bankruptcy Code on account of prepetition claims.

117. The majority of the Debtors' employees rely exclusively or primarily on these programs to pay their daily living expenses and to support themselves and their families. Any delay in payment could cause the Debtors to lose the benefit of their employees' services, which would jeopardize the reorganization and lead to rapid deterioration in the value of the business. Reuland met payroll every week throughout two years of severe financial strain. It should not miss one now that it is under the protection of this Court.

**D. Cash Management Motion**

118. Pursuant to the Cash Management Motion, the Debtors seek authority to continue using their existing cash management system, existing bank accounts, and existing business forms;

to open and close bank accounts as necessary; authority for the banks participating in the cash management system to honor certain transfers; and related relief.

119. The Debtors maintain their cash management system in the ordinary course of operations. A list of the bank accounts is attached to the Cash Management Motion.

120. Reuland maintains four bank accounts and OnCore maintains one. A list is attached to the Cash Management Motion. Reuland's operating account is a checking account at Hilltop Bank. Customer payments are received into that account, and Reuland pays its operating expenses and funds its payroll from it. Reuland also maintains a checking account at Bank of Ann Arbor, used by the Howell, Michigan operation for petty cash and minor purchases; a checking account at Wells Fargo, used to issue manual payroll checks; and an investment account at Hilltop Bank, which sweeps the operating account balance overnight and returns it the following business day. OnCore's account is a checking account at Oakworth Capital Bank holding a nominal balance.

121. The Hilltop operating account is the collection account described in Part II of this Declaration. AFS asserts a security interest in that account and in the funds in it. AFS has never held a control agreement or any other legal authority over the account, which Reuland has at all times owned and controlled.

122. The route customer payments take has changed several times during 2026, and each change was made at AFS's direction. Before March 2026, customer checks were deposited into an account AFS maintained at Wells Fargo. In April 2026, deposits moved to Reuland's Hilltop account.

123. On July 17, 2026, AFS directed that customer checks be deposited into a daily deposit account at Stearns Bank, which had acquired AFS. After AFS accelerated its loan and wrote to Reuland's customers, Reuland began depositing certain customer checks into its own

Wells Fargo account and transferring funds to the Hilltop account as needed. I made that decision because AFS had stopped funding and stopped responding, and I could not risk having the account that holds our payroll swept. I describe it here because it bears on the matters in dispute with AFS, and the Debtors reserve all rights.

124. I understand that the United States Trustee Guidelines require chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession accounts, establish a new payroll account, and maintain funds in excess of current operating requirements in an interest-bearing account. Reuland runs a continuous manufacturing operation with hundreds of active supplier relationships and weekly payroll across four plants. Closing and reopening the accounts on the first days of these cases would create precisely the disruption these First Day Pleadings are designed to prevent. The Debtors have the capacity to draw clear distinctions between prepetition and postpetition obligations and payments without closing the existing accounts.

**E. Insurance Motion**

125. Pursuant to the Insurance Motion, the Debtors seek authority to continue their insurance program and to pay all prepetition and postpetition obligations relating to it, and to direct financial institutions to honor related checks and transfers.

126. The Debtors maintain property, general liability, commercial automobile, umbrella, cyber liability, employment practices liability, executive, and business travel accident coverage, together with workers' compensation coverage in every state in which they operate.

127. Workers' compensation coverage warrants particular attention. Reuland's workers' compensation program is a large-deductible program under which Reuland bears the first $150,000 of each claim. There are currently open indemnity claims, several of which are in litigation.

Workers' compensation coverage is mandatory in every state in which Reuland operates. A lapse would require Reuland to cease operations at its plants and could expose its officers to personal liability.

128. The Debtors do not finance any insurance premiums through a premium finance company. The workers' compensation program is billed by the carrier directly in monthly installments over the policy term, and the Debtors seek authority to continue making those installment payments in the ordinary course.

**F. Utilities Motion**

129. Pursuant to the Utilities Motion, the Debtors seek approval of a proposed form of adequate assurance of postpetition payment to their utility providers; approval of procedures for resolving any objections by utility providers to that proposed adequate assurance; an order prohibiting utility providers from altering, refusing, or discontinuing service to, or discriminating against, the Debtors solely on the basis of the commencement of these cases, a prepetition debt, or any perceived inadequacy of the proposed adequate assurance; and related relief.

130. The Debtors' aggregate average monthly utility expense is approximately $55,900 across electricity, natural gas, water, sewer, trash, telecommunications, internet, and data services at four sites in California, one in Michigan, and an engineering office in Ohio.

131. The Debtors believe they are current with each of their utility providers as of the Petition Date. The Debtors are continuing to determine whether any utility provider holds a deposit, letter of credit, or other prepayment from the Debtors, and will supplement the record if any is identified. To the extent a provider holds such security, the Debtors reserve the right to seek a corresponding reduction in the adequate assurance proposed in the Utilities Motion.

132. Reuland operates an aluminum casting foundry, more than fifteen CNC machining centers, and motor winding, assembly, and test operations. An interruption in electrical or gas service does not slow this business down, it stops it, and in the case of the foundry an unplanned interruption risks damage to equipment and to work in process. Data connectivity is equally critical: Reuland manages 500 to 700 simultaneous custom orders through its enterprise system, and a loss of connectivity at a plant halts production scheduling and shipping.

133. Without the protections afforded by the proposed adequate assurance procedures, the Debtors would be forced to address ad hoc demands from utility providers in a disorganized fashion during the critical initial stage of these cases, when management's attention should be devoted to stabilizing operations.

**G. Customer Programs Motion**

134. Pursuant to the Customer Programs Motion, the Debtors seek authority to honor prepetition customer obligations and to continue their customer programs in the ordinary course, including applying prepetition deposits, initial payments, and progress payments as credits against the applicable orders, completing and shipping against those orders, continuing to solicit and receive deposits and progress payments postpetition on existing terms, and issuing refunds, credits, returns, and allowances in the ordinary course subject to an aggregate cap.

135. Depending on the size of an order, Reuland receives an initial payment and progress payments from its customers. As of the Petition Date, Reuland held approximately $3,187,644 in cash-in-advance customer deposits and progress payments that have not yet been fully earned, owing to approximately 85 customers. Eleven of those customers account for approximately $2,063,386 of that balance. These amounts are not refundable if a customer cancels, and they are

used by Reuland to purchase the raw material and fund the labor required to build the customer's order.

136. Almost all of the relief requested does not involve the payment of cash to a prepetition creditor. Honoring a customer deposit means building the motor the customer ordered and crediting the deposit against the invoice. That is continued performance in the ordinary course. Only refunds and credits involve cash leaving the estates, and the Debtors propose an aggregate cap on those amounts based on historical experience.

137. The commercial necessity for this relief is acute given what has already happened. AFS's letters have caused some customers to hold payment out of fear of paying the wrong party. If those customers were also to learn that Reuland would not honor deposits they have already paid on custom motors already in production, the Debtors would lose not merely the orders but the entire relationships and all the future business.

**H. Extension Motion**

138. I understand that the Bankruptcy Code and Bankruptcy Rules require the Debtors to file with the Court within fourteen days of the Petition Date their schedules of assets and liabilities, their statements of financial affairs, their schedules of current income and expenditures, their lists of executory contracts and unexpired leases, and their lists of equity security holders (collectively, the "Schedules and Statements").

139. By the Extension Motion, the Debtors seek an order extending the time for filing the Schedules and Statements by an additional 30 days, for a total of 44 days from the Petition Date. The Debtors have already begun the task of gathering the necessary information. Reuland has approximately 280 trade creditors, fifty-seven separate equipment financing arrangements with approximately twenty lenders, four manufacturing facilities across two states, several leased

premises, and hundreds of open customer orders. In addition, management's immediate attention is necessarily devoted to stabilizing customer collections in the wake of AFS's notifications. An extension will allow the Debtors to prepare accurate and complete Schedules and Statements rather than filing incomplete ones that would require amendment.

**I. Expedited Hearing Motion**

140. The First Day Pleadings described above involve matters requiring expedited consideration. The Debtors request that the Court schedule a hearing on the First Day Pleadings as soon as the Court's schedule permits on September 8 or 9, 2026, and approve the form of notice of that hearing.

141. The relief requested is necessary to ensure a smooth transition into chapter 11, to maintain the Debtors' operations and business throughout these cases, to administer these cases efficiently, and to establish the basis for the Debtors' restructuring efforts. Any delay could have a severe and irreparable effect on the Debtors' operations and their transition into operating as debtors in possession.

## CONCLUSION

142. Reuland has built motors in the United States for eighty-nine years. Its motors turn the bridges that carry American traffic across American rivers, and they run on American Navy vessels. It employs 194 people, several of whom have given the company fifty years. It is profitable, it has a $14 million backlog, and it is current with every secured lender but one. There is a serious dispute with its working capital lender, and that dispute will be resolved on a complete record in the appropriate forum. What Reuland respectfully requests from this Court on the first day is narrower: the ability to keep operating, the continued use of its own cash under the

supervision of this Court, and the opportunity to replace a single lending relationship rather than be dismantled by a receiver before the merits are ever reached.

143. For the reasons stated in this Declaration, and in each of the First Day Pleadings filed concurrently with or in connection with the Chapter 11 Cases, the Debtors respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as the Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: September 3, 2026

*<u>/s/ Grant R. Bibby</u>*
Grant R. Bibby
President and Chief Executive Officer,
OnCore Motor Group LLC and
Reuland Electric Co.

# EXHIBIT A

***Organizational Chart***

# REULAND ELECTRIC CO.

Corporate Organizational Chart — Supports All Facilities




Positions marked "Open" are currently unfilled.

**Total Employees: 42**